UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GIORGIO PROUSE
Via Patroclo n. 19
Milan Italy,

              Petitioner,
  and

ROBIN K. THORESON
1445 North State Parkway, #308
Chicago, Illinois 60610,

              Respondent.

Case No.: 12-CV-644

**RESPONDENT'S BRIEF IN OPPOSITION TO ORDER TO
SHOW CAUSE FOR PROVISIONAL RELIEF**

A. **TO PREVAIL ON HIS MOTION FOR PROVISIONAL RELIEF, RESPONDENT MUST MEET THE REQUIREMENTS OF FED. R. CIV. P. 65 FOR A PRELIMINARY INJUNCTION.**

Petitioner's request for the Respondent to "show cause why the parties' daughter should not be immediately returned to her home in Milan, Italy" should be interpreted as a request for provisional relief under 42 U.S.C. §11604. Citing to Fed. R. Civ. P. 65, the standard for a grant of provisional relief under the International Child Abduction Remedies Act (ICARA) is succinctly set forth in an Eighth Circuit case:

> It is well-settled in this circuit that applications for preliminary injunctions and temporary restraining orders are generally measured against the standards set forth in the decision of the Eighth Circuit Court of Appeals in *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (en banc). *See Branstad v. Glickman,* 118 F.Supp.2d 925, 937 (N.D. Iowa 2000); *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1411 (N.D.Iowa 1996). These factors include (1) the movant's probability of success on the merits, (2) the threat of irreparable harm to the movant

1

> absent the injunction, (3) the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and (4) the public interest. *Dataphase,* 640 F.2d at 114; *accord Branstad,* 118 F.Supp.2d at 937 (quoting similar factors from *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887, 889 (8th Cir.2000)); Fed. R. Civ. P. 65(b)(1).

*Morgan v. Morgan*, 289 F. Supp. 2d 1067, 1069 (N.D. Iowa 2003)

While Respondent could not locate a similar case involving an alleged child abduction in the Seventh Circuit, this Court has previously addressed the standard for the issuance of provisional relief in the form of a temporary injunction under Rule 65 and found the same test to apply.  In *JT Packard & Associates, Inc. v. Smith,* 429 F. Supp. 2d 1052 (W.D. Wis. 2005) this court explained the requisite showing to entitle a party to such relief.

> To obtain a preliminary injunction, plaintiff must prove that it has a likelihood of success on the merits, it is threatened with irreparable harm, the harm it would suffer if the injunction is not granted outweighs the harm to defendants if the injunction is granted, and the grant of an injunction would be in the public interest.

*Id.* at 1054.

The Petitioner makes only unsupported conclusory allegations in his Petition. Nothing is alleged that shows any irreparable harm would ensue if the OTSC is denied pending a full hearing on the merits.  There is no allegation that the child is subject to physical, mental or emotional abuse that would require her immediate uprooting from her current residence, school, friends and family here in Wisconsin.  Indeed the facts will show that Respondent is the parent who has repeatedly attempted to keep communication open between the petitioner and the minor child.

There are no facts or allegations warranting an immediate Order be entered for the imminent return of this child based on a hearing held just six (6) working **days** after service of the Petition on Respondent. The Hague Convention itself at Article 11 provides for a decision to be reached within six (6) **weeks** of the commencement of the action. All authorities indicate that the question of "habitual residence" is "fact intensive" and this Court must take the time necessary to allow it to make thorough findings of fact.

Additionally, 42 U.S.C. §11604(b) does not permit the removal of the child from the Respondent unless applicable requirements of state law are satisfied. Petitioner has not even attempted to make any such showing.

Finally, the period of time afforded Respondent under Fed. R. Civ. P. 12(a)(1) to file her answer and state her affirmative defenses has not yet elapsed. Entry of an immediate order to return the child to her home in Italy would deprive the Respondent of an opportunity to conduct discovery, develop her case and present it fully on the merits. Orders issued under such circumstances have been upset in numerous instances. *See, for example*, *Commodity Futures Trading Commission v. Board of Trade of Chicago*, 657 F.2d 124, 127 (7th Cir.1981). Such an immediate order in this case should be afforded an enhanced level of disfavor given its putative impact on the Respondent's constitutionally protected liberty interest in her relationship with her daughter.

B. **PETITIONER CANNOT SUCCEED ON THE MERITS OF HIS "PETITION FOR RETURN OF CHILD TO PETITIONER UNDER THE HAGUE CONVENTION ON CIVIL REMEDIES FOR INTERNATIONAL CHILD ABDUCTION".**

      1.     **Background Facts**

The true facts in this case are vastly different than the unsworn and unsupported, allegations set forth in the Petition as filed with this Court on September 5, 2012. The facts will show that Petitioner (hereinafter "Giorgio") and Respondent (hereinafter "Robin") made a mutual decision in the fall of 2011 to relocate to the United States. Robin and the child were to move permanently to the United States in late December, 2011 Giorgio, in a residency as a vascular surgeon in Italy, was to join them permanently, when his residency was completed.

The Petitioner himself wrote to the minor child's school, the International School of Milan, and advised that she would not be attending the school after the 21st of December 2011. The Petitioner himself contacted a real estate agent and the parties listed their Milan home with that agent for rent or sale in November of 2011 and subsequently signed a four-year lease on the home with a four-year option to extend effective February 1, 2012.

By mutual agreement, on December 28th, 2011, the Respondent and the minor child (hereinafter "Julia") flew to the United States with family pets and relocated their "habitual residence". Petitioner himself purchased the roundtrip tickets on Swiss Air instead of utilizing Robin's benefits on American Airlines to allow some of the family pets to travel with Robin and Julia in the cabin to facilitate their move to their new home.

The parties made the joint decision that the Julia would stay with her maternal grandparents in Beloit, Wisconsin to attend school so that the Respondent could pick up additional flights and work more to assist in solving the financial problems the family was facing. Robin still owned the condo in Chicago she lived in prior to the marriage. She "rented" it and shared it with her roommate as a home-base during her employment. When she is not working, she spends all of her time with her daughter.

After getting Julia settled in her new school, Townville Elementary in Beloit, the Respondent flew back to Milan on January 7, 2012, and completed the packing and cleaning of the prior marital residence. She stayed three or four days and utilized her American Airlines privileges and flew standby to Milan. Upon her return, she carried the family hamster in her flight bag and a family dog on Lufthansa Airlines. On or about January 12, 2012, Giorgio flew to the US and joined the family in Beloit for Julia's 8th birthday party. When he came to the US, Giorgio flew on Lufthansa airlines as well to allow him to bring another pet, Dotty the cat, which has had significant health issues, to live with Julia.

On or about March 30, 2012, Robin and Julia returned to Milan for Easter break utilizing the return portion of their Swiss Air ticket from their December departure. After spending the week in Europe, with Julia taking a skiing trip to Switzerland with her father, Robin and Julia returned to the US utilizing Robin's American Airline benefits and without any return tickets or plans. The reason there were no return travel plans is because the parties had previously agreed that they would move to the US to pursue more lucrative employment opportunities.

On Friday, April 13, 2012, while Robin was working an international flight, Giorgio informed her on the telephone that he no longer wanted to be married to her. This came as a complete shock and surprise to Robin. After working her return leg to Chicago, she immediately turned around and flew back to Milan on April 16th to see Giorgio and ask him to go to counseling and attempt to save their marriage and family. He has consistently refused her offers to do so.

In June, Giorgio came to the US to attend his sister's wedding in Washington, D.C. Robin took Julia to O'Hare and met Giorgio so he could take Julia to the wedding. Giorgio and Julia traveled to and from Washington on Robin's American Airline privileges. Perhaps the most telling piece of evidence as to the parties joint decision for Julia to relocate to the US is an e-mail exchange and accompanying purchase of an airline ticket for Julia to travel to Milan on or about Saturday July 14, 2012, with a return date of Saturday August 4, 2012, to Chicago. The evidence will show that Giorgio initially inquired to make this booking and complained to Robin that the cost was $2,800 and that seemed "steep". Robin then made the booking with her discount at $2,275. If Giorgio is to be believed that he "intended" for Julia to be back in Milan to begin the school year at the end of August/early September, why would he be booking a three week vacation in July-August with Julia returning to the US in August? This ticket is good for one year, and the trip was cancelled at Julia's request because Dotty had kidney failure and she did not want to be away from her favorite pet for such a long period of time. The evidence will show Giorgio acknowledged Julia's concern in a July 10, 2012 e-mail and agreed to reschedule the trip "somerhing different some other time." (sic)

6

The Petitioner has never clearly communicated any desire for Julia to be returned or made any plans for her to return and to live in Milan. It appears that he filed this action in retaliation for Robin's difficult decision to file for the termination of the marriage in light of Giorgio's unilateral announcement that he no longer wanted to be married to her.

> 2. **There Was No "Wrongful Removal Or Retention" Under The Hague Convention To Trigger The Enforcement Provisions of 42 U.S.C. §11601 *Et. Seq.* (ICARA)**

42 U.S.C. §11603 "Judicial remedies" provides at (e) (2) (B):

> (2) in the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing- -
> …
> (B) **by a preponderance of the evidence** that any other exception set forth in article 12 or 13 of the Convention applies. (emphasis added)

It is important to note that the burden of proof on the Respondent is less than the "clear and convincing" standard required to show that the return would expose the child to a grave risk of harm under Article 13 b) of the Convention or a violation of the fundamental principles relating to human rights and fundamental freedoms under Article 20.

> Article 13 of the Hague Convention provides:
>
> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that-
> a) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, **or had consented to** or subsequently acquiesced in **the removal or retention**; or…(emphasis added.)

7

The facts establish that the parties shared a mutual intent to permanently relocate to the United States when Robin and Julia left Milan in December of 2011. They rented out the marital home for a term of four to eight years, wrote Julia's school advising she would not be returning after December 21, 2011, and made several trips to relocate the family pets. Our Seventh Circuit adopted the analysis set forth by the Ninth Circuit in the seminal case of *Mozes v Mozes,* 239 F. 3d 1067 (9th Cir. 2001) in its decision in *Koch v. Koch* 450 F. 3d 703 (7th Cir. 2006). As Petitioner's Brief points out, the test is in determining a child's habitual residence is:

> Following *Mozes,* most of our sister circuits **focused on the parents' last shared intent in determining habitual residence**. *See, e.g., Gitter,* 396 F.3d at 131-33 (finding the *Mozes* opinion "particularly instructive" in determining habitual residence by considering the intentions of the parents as of the last time their intentions were shared); *Ruiz,* 392 F.3d at 1252-55
>
> *Koch* at 715. (emphasis added.)

Keeping in mind the axiom that "actions speak louder than words, the Court in *Koch* went on to point out that "In determining the parents' intent, **the court should look at actions as well as declarations.** *Gitter,* 396 F.3d at 134." *Koch* 715. (emphasis added.) This Court is faced with determining the intent of the parties based on all of their actions and the Petitioner's repeated behavior in confirming the joint decision to relocate to the United States. Here, the problem is that foreshadowed by the Court in *Koch*:

> Often, by the time one parent has filed an action under the Convention for the return of a child, the parents no longer share an intent on the child's habitual residence. Because of this complication, the *Mozes* court acknowledged that the representations of the parties likely cannot be accepted at face value, and the court should determine "from all available evidence whether the parent petitioning for return of a child has already

agreed to the child's taking up habitual residence where it is." 239 F.3d at 1076.

*Koch,* at 713.

Respondent will prove by a preponderance of the evidence that Petitioner has agreed to Julia's relocation to the United States and acquiesced in that agreement for eight months. It is only now, when Robin has filed for divorce in the US that he is for the first time demanding Julia's return and misrepresenting to this Court the parties' agreed intent at the time the family left Italy. He may have changed his mind, but that does not result in a change in the original intent of the parties, nor does it give rise to a cause of action under ICARA, this is simply a case of "buyer's remorse".

Perhaps the most telling e-mail exchange confirming Giorgio's intent is that from January 7, 2012, when Julia and Robin have already moved to the US. He inquires as to whether they could arrange for him to take Julia on a ski trip to Vail sometime in March. In discussing his return leg, he proposes that Robin book it "for the end of August when it is hard to return." The parties utilize paid tickets when travel is busy and there is a low probability of being able to secure a seat on Robin's American Airline's stand by basis. This exchange never mentions Julia or Robin's return at the end of August or at any time because the parties never intended for Julia or Robin to be returning to Milan to live in August or at any point in the foreseeable future. They intended to relocate and establish their habitual residence here in the US and did so.

9

### 3. The United States Is Now The Habitual Residence Of The Minor Child.

*Mozes* sets forth a two-step analysis in determining a child's "habitual residence". The first test involves the inquiry as to whether or not the parents demonstrated an intent to abandon the prior habitual residence. *Id* at 1075. All of the evidence as recited above confirms the parties to this action made a joint decision to move their residence to the US. The second step of the analysis inquires as to whether there has been a change in geography for an appreciable period of time so that the child has become settled or "acclimatized". *Id* at 1078.

The intent of the parties has been clearly demonstrated by their actions and e-mails. Julia has completed one term at Townville Elementary School where she has excelled in all areas and connected with a new group of friends and become involved in regular activities including swimming. Her school guidance counselor will testify she is happy, outgoing, makes friends easily and is well settled in her new school. Julia has regular horseback riding lessons where she also attends camp in the summer. She is currently precluded from participating in her horseback riding as her coach's facility is located one mile over the Illinois border. This activity is Julia's first love; she has a great passion for animals as demonstrated by her devotion to her pets. She also lives with her maternal grandparents and is socially active with her peers. Julia has become well settled in her school and home here in Wisconsin over the course of the last nearly nine months.

Most of the cases wherein a court has found a lack of change in habitual residence involve situations where one parent has surreptitiously removed a child or children. This

case is entirely different and the child is here with the full consent and acquiescence of both parties.

### 4. Petitioner Has Not Been Denied Any Access To The Minor Child Nor Have Her Whereabouts Been Concealed At Any Time.

The e-mails and visits between the parties will show the respondent has never concealed Julia from her father or attempted to interfere with his communication or access to her. In fact the e-mail pattern will show the respondent suggested they obtain a phone for Julia to have it available in order to receive calls from Giorgio when she is travelling for her job. The evidence will show Robin pleaded with Giorgio to contact their daughter and his reticence to do so as he expressed, he does "not know what to say to her".

### 5. Respondent Has Clearly Demonstrated There Is No Risk Of Her Removing The Minor Child.

Respondent has been more than transparent in her movements with Julia. The e-mails will establish she kept Giorgio informed of their trip to Arizona to a ranch that Giorgio approved of and contributed toward Julia's tuition. The evidence will further show that when Robin wanted to take Julia to Colorado for a trip in August, she voluntarily sought and obtained permission from the Illinois Court handling the marital dissolution action and posted $750 bond before she undertook the trip. Petitioner simply cannot demonstrate any risk of removal or concealment of Julia which would give rise to the need for any extraordinary relief. Robin has acted honorably and transparently in all of her dealings involving the parties' minor child, while Petitioner is being vengeful,

dishonest and vindictive in his actions after he decided to end the marriage. He has not contributed to Julia's support, and his current actions have precluded Robin from engaging in her normal course of employment because he has sworn out unfounded criminal charges in Italy, her designated route of travel for purposes of employment and the sole means of support for her and Julia.

### C. CONCLUSION

Respondent respectfully requests that this Court deny Petitioner's Motion for Immediate return of the Minor Child this date and further dismiss his "Petition For Return Of Child To Petitioner Under The Hague Convention On Civil Remedies For International Child Abduction" on its merits based on its frivolous nature and award Respondent actual attorney fees and costs in defending this action, which is without any good faith basis in fact or law.

Dated this 12th day of September, 2012.

SIPSMA, HAHN & BROPHY, L.L.C.

By:    /s/ *Kenneth R. Sipsma*
Kenneth R. Sipsma
State Bar Member No. 1022383
Josann M. Reynolds
State Bar Member No. 1014655
701 East Washington Avenue, Suite 201
Madison, Wisconsin 53703
(608) 243-1230
*ksipsma@shblawyer.com*

ATTORNEYS FOR ROBIN K. THORESON