UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GIORGIO PROUSE

                Case No.: 12-CV-644

      and          Petitioner,

ROBIN K. THORESON

          Respondent.

## RESPONDENT'S POST HEARING BRIEF IN OPPOSITION TO PETITION FOR RETURN OF CHILD

## I.  PROCEDURAL STATUS

Respondent, Robin K. Thoreson, continues to object, respectfully, to the expedited scheduling in this case.  The expedited evidentiary hearing obviated discovery and denied Ms. Thoreson the right to present all evidence relevant to a final decision on the Petition.

The Fourteenth Amendment's Due Process Clause has a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests," *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772, including parents' fundamental right to make decisions concerning the care, custody, and control of their children, see, *e.g., Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551. Pp. 2059–2060.  *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 2056, 147 L. Ed. 2d 49 (2000).

The evidence as to the parties' financial circumstances and marital relationship showed there to be a negligible chance Ms. Thoreson would take up her residence in Italy

if the child is ordered returned.  As such, this Court's order to return the child to Italy would be a significant government interference in Ms. Thoreson's fundamental right to make decisions concerning the care, custody and control of her daughter.

Ms. Thoreson had three (3) working days to prepare for the initial appearance before this Court of September 12th and the hearing on September 18th and only six (6) working days from the date of the original service of the Petition.   The Hague Convention itself at Article 11 provides for a decision to be reached within six (6) weeks of the commencement of an action.

Dr. Prouse's pleadings created an atmosphere of "emergency."  The initial evidence belies an emergency.  Provisional relief assures the child, J.P., will not be removed from the Court's jurisdiction and the parties have been able to work out agreements so the Petitioner, Dr. Prouse, has continuing contact with his daughter.

Under these circumstances, Ms. Thoreson respectfully submits that a pretrial conference and scheduling order pursuant to Fed. R. Civ. P. 16 in anticipation of a full hearing on the merits is appropriate.

## II.  DR. PROUSE'S "FACTS"

Dr. Prouse took great liberty in arguing the facts in pages 2 through 4 of his Brief. To wit,

> *(a)    Ms. Thoreson testified that Dr. Prouse leased out their home in Milan and she cleaned it out for purposes of moving. However, upon Ms. Thoreson and J.P.'s departure from the home, Dr. Prouse moved to the apartment that all three had lived in previously and, although it is smaller, it is adjacent to his mother's home (J.P.'s paternal grandmother with whom J.P. is close) and his mother's home has 5 bedrooms;*

2

> *moreover, he is now moving back into the family residence because his tenant is leaving (Trial Transcript, p 57, lines 20-22).*

In the fall or early winter of 2011, the parties listed their home for sale or lease and signed a lease for four (4) years commencing February 1, 2012 with a four (4) year option to renew.  (Trial Tr. p. 54 lines 5 through p.55 line 11; and p. 66 lines 4-9, ECF No. 24).  Dr. Prouse claims "he is now moving back into the family residence because his tenant is leaving."  Dr. Prouse cannot turn back the hands of time.  At the time Ms. Thoreson and the child left to the United States, *the former marital home was leased for four* years.  The was no intention whatsoever for anyone in the family to return to the home for at least four years.  It is disingenuous now for Dr. Prouse to somehow imply now that the unexpected termination of the lease supports his contention that the child was to return to Italy in the summer of 2012.  Moreover, Dr. Prouse did not present any evidence to show that the financial difficulties that had prompted the lease were now alleviated such that he and the child would be able to again afford the house.   Dr. Prouse moved into a one bedroom below ground apartment when Ms. Thoreson and the child departed for the United States. (Trial Tr. p. 58 lines 13-16, ECF No. 24).  He did so because he did not expect or anticipate the child would be returning to live in Italy.

> *(b)  Ms. Thoreson and J.P. left family pets, including several dogs and a horse, behind in Italy (Trial Transcript, p 102, lines 8-16).*

The parties purchased round trip airline tickets on Swiss Air to allow Ms. Thoreson and J.P. to relocate several pets when they moved to Beloit in December of 2011. (Trial Tr. p.104 lines 13-18 and p. 68 lines 16 through p.69 line 1, ECF No. 24).

Ms. Thoreson's horse was already dead by the time she left Italy; her horse did not

"subsequently die".   (Trial Tr. p. 74 lines 6 -19, ECF No. 24).

> *(c)   J.P. left many of her clothes and toys in Milan (Trial*
> *Transcript, p. 50, lines 11-19).*

J.P. did not leave any personal items behind in Italy other than clothing that no

longer fit her and toys that are no longer age appropriate.   (Trial Tr. p.73 lines 20

through p.74 line 5, ECF No. 24).

> *(d)   Ms. Thoreson left clothes and personal belongings in*
> *Milan; Ms. Thoreson left a car in Milan (Trial Transcript,*
> *p.50, lines 24-25; p. 114, lines 10-12).*

The only things Mrs. Thoreson left behind in Italy were her saddle and a pair of riding

boots.    (Trial Tr. p.73 lines 14-19, ECF No. 24).  Items that were of no use to her with a

dead horse.  The car she left behind was a 1998 car she did not drive on a regular basis

which bears license plates from Illinois, here in the United States, (Trial Tr. p. 114 lines

10 -17, ECF No. 24).

> *(e)     Although Dr. Prouse wrote to J.P.'s school in Milan in*
> *early September 2011 (9/2/11) telling the school that J.P.*
> *would no longer be attending the school effective December*
> *21, 2011, because of "our" move to the United States, the*
> *evidence established that he wrote this letter referring to*
> *"our" move because he hoped that the school would refund a*
> *portion of the very expensive tuition that he had paid (Trial*
> *Transcript, p. 56, lines 4-11).*

Petitioner himself wrote to J.P.'s school in September of 2011 telling the school that the

family was moving to the United States "due to sudden unexpected reasons of work."

(Trial Tr. p. 55 lines 17 through p.56 lines 1 -15, ECF No. 24).  This is entirely consistent

with the intent and actions of the parties in moving J.P to the United States.  If J.P. was returning to Italy the following semester, Petitioner could have easily requested a credit on her tuition instead of lying to her school.  The truth is, J.P. was not expected to return to Italy.

> *(f)     Dr. Prouse and Ms. Thoreson discussed several different places to live after he completed his residency. These included Switzerland, South Africa, Australia, and the United States. These were all possibilities, but no decision was made (Transcript, p.99, lines 19-23; p. 28, lines 5-10).*

The parties did discuss the options of moving to Switzerland, South Africa, Australia or the United States and jointly agreed upon the United States, as clearly demonstrated by J.P. and Ms. Thoreson moving here in December of 2011. (Trial Tr. p. 99 line 19 through p.101 line 4 and p. 28 lines 24 through p.29 line 10, ECF No. 24).

> *(g)     Dr. Prouse never seriously looked to move to the United States at all. He still was in residency when Ms. Thoreson and J.P. left in December 2011. He testified that he has no medical license in the United States and it will be very difficult to get one. The United States would not accept his Italian medical degree and he would likely need to start over with a new residency. (Transcript, p. 65, lines 8-13) Dr. Prouse did not apply anywhere in the United States and he confirmed in testimony that he had not taken any steps to obtain a license to practice medicine in the United States. (Trial Transcript, p 12, lines 5-7) Ms. Thoreson admitted that she was unaware of any programs or places that Dr. Prouse would be applying to in the United States. (Trial Transcript., pp 101-03)*

All of Petitioner's actions and communications confirmed he intended for his family to move to the United States.  If he had reservations about his ability to obtain his medical

license in the United States, he should have explained this fact to Mrs. Thoreson prior to formulating a plan for the family to relocate their residence to the United States.

### III.  CREDIBILITY OF THE PARTIES

The Court observed the testimony of the parties.  Dr. Prouse was very charming and smooth in his performance.  Charm and smoothness do not equate to credibility.  His very first answer was a misrepresentation as to where he lives.  (Trial Tr. p.9 lines 12-13 and p. 52 lines 23- p.53 line 15; p. 57 line 18- p. 58 line 6, ECF No. 24).  When caught in his misrepresentations, he always had an explanation.  Yet every pleading file in this case by Dr. Prouse, along with his sworn testimony, misrepresents his residence.

Dr. Prouse attempted to explain his letter to J.P.'s school in September of 2011 which included the "excuse of all of us moving instantly for work" to the United States as a misrepresentation with the intent to obtain a refund on J.P.'s school tuition.  (Trial Tr. p.61 lines 5-15, ECF No. 24)  In other words, Dr. Prouse is willing to lie to obtain an advantage.

Similarly, to gain an advantage, Dr. Prouse misrepresents to this Court that J.P.'s move to the United States was to be temporary.  In actuality this fallacy was created by Dr. Prouse in late July 2012 after he was served with the Illinois divorce papers and retained counsel.  (Trial Tr. p. 44 lines 11-23, ECF No. 24; Aff. of Attorney Tom Glasgow ¶¶ 5-8 and Ex. B thereto; Respondent's Trial Ex.21; and Petitioner's Trial Ex. 3 & 4).  There is not a scintilla of evidence, that prior to being served with the Illinois divorce papers, Dr. Prouse intended J.P. to return to Italy after one semester of school in the United States.  Dr. Prouse is the party pursuing the Hague action merely to obtain an advantage after being brought within the jurisdiction of the Illinois family court.

6

Dr. Prouse's explanation as to why there is no evidence of any communication regarding J.P.'s alleged planned return to Italy for the fall school year is because "he likes to discuss things in person".  (Trial Tr. p. 57 lines 8 -17, ECF No. 24).  This is the same man who ended his marriage to Ms. Thoreson via a telephone call while she was working as a flight attendant on a lay-over in Rome, Italy.  (Trial Tr. p. 78 lines 6-25, ECF No. 24; Respondent's Trial Ex. 10).  Yet when he chooses to communicate in writing, he certainly does so, as the evidence shows.  The reason there is no written evidence of Dr. Prouse's claimed intention that J.P. return to Italy in the summer of 2012 is quite simple.  That was not his intention.  Dr. Prouse testimony is simply not to be believed.

## IV.  FACTS

(a) In the summer/fall of 2011 the parties were experiencing financial difficulties and agreed a move was necessary to improve their employment opportunities. The decision was made to move to the United States because Ms. Thoreson did not feel safe moving to South Africa, she could not work in Australia and the United States offered the best economic solution.   (Trial Tr. p. 99 line 19- through p.101 line 4 and p. 28 lines 24 through p.29 line 10, ECF No. 24).

(b)  Petitioner then rented out the family home for four (4) years commencing February 1, 2012 with a four (4) year right of renewal.  (Trial Tr. p. 54 lines 5 through p.55 line 11 ECF No. 24 and Respondent's Trial Ex. 1)

(c)  September 2, 2011, Petitioner wrote and advised J.P.'s school that the family was moving to the United States for a work situation and that she would no longer be

attending school; (Trial Tr p. 66 lines 4-9 and p. 55 lines 17 through p.56 lines 1 -15 ECF No. 24 along with Respondent's Trial Ex. 2).

(d)   December 28, 2011, J.P. and Ms. Thoreson move to the United States traveling on round trip airline tickets Dr. Prouse purchased on Swiss Air for Ms. Thoreson and J.P., to allow them to travel from Italy to the United States in order to move family pets in December of 2011. (Trial Tr. p.104 lines 13-18 and p. 68 lines 16 through p.69 line 1, ECF No. 24).

(e)   January 7, 2012, Ms. Thoreson flew back to Milan to finish cleaning and packing their previous home. She flew in to Italy on her American Airline passes and left two or three days later, on a purchased Lufthansa ticket to enable her to bring J.P.'s dog and hamster back with her to the U.S.  Lufthansa and Swiss Air are the only airlines that allow passengers to carry animals. (Trial Tr. p.73 lines 3-13, p.74 lines 6-17 and p. 68 lines 20-24, ECF No. 24).

(f)   On January 7, 2012, Petitioner had Ms. Thoreson purchase tickets for him to travel to the United States to visit Ms. Thoreson and J.P. in January 2012 for J.P.'s birthday.  He requested the purchased tickets on Lufthansa Airlines to guarantee his seat, because traveling on Ms. Thoreson's passes does not ensure a seat.  He asked Ms. Thoreson to book the return portion of his Lufthansa flight for August "when returning to Italy would be difficult".   (Trial Tr. p.98 lines 1-23, ECF No. 24; Respondent's Trial Ex. 24). No plan was made or tickets purchased for J.P.'s "return" to Italy in August. (Trial Tr. p.98 lines 24 through p. 99 line 3, ECF No. 24).

(g) March-April of 2012, when Ms. Thoreson and J.P. returned for the Easter break they flew to Italy on the return leg of their Swiss Air tickets from December.   (Trial Tr. p.75 lines 7-17, ECF No.24; Respondent's Trial Ex. 8).

(h) On April 13, 2012, Dr. Prouse advised Ms. Thoreson in a telephone call that he had unilaterally changed his mind about the "family" plans and decided he no longer wanted to be married to Ms. Thoreson. (Trial Tr. p.78 lines 6 through 25, ECF No. 24).

(i) April 17, 2012, Ms. Thoreson travels to Italy to speak with Dr. Prouse, and when she inquires where she and J.P. will live, he indicates that "the United States is a big place" and that Arizona would be a good place to move to be with Michelle, who will find "joy" in helping raise J.P. because Michelle "really loves" J.P. (Trial Transcript p.114 lines 18 through p. 116 line 1).

(j) On July 13, 2012, after telling her of his decision to end their marriage in a telephone call in April, he confirmed that "As you sayd (sic)…it was all my choice." He also pointed out "**And if you ever feel like it you can keep me updated. Afterall** (sic) **i** (sic) **am still her father, at least from a biological point of view even though it will be some other man that will bring her up and that she will grow up with.**" (Trial Tr. p.85 lines 20-p. 86 line 12, ECF No. 24; Respondent's Trial Ex. 13). This is not the statement of a man who intended for his daughter to be returning to live in Italy in the following weeks.  This e-mail confirms Petitioner intended for J.P. to move to the United States for the indefinite future with her mother.

9

(k) July 14th through Saturday August 4th, Petitioner made plans for J.P. to visit him in Italy for three (3) weeks.  (Trial Tr. p.86 lines 13- p.87 line 7, ECF No. 24; and Respondent's Trial Exhibits 14 & 15).  Why would the financially strapped parties pay $2,204 for a ticket for J.P. to visit Italy for three weeks in July/August if she was returning at the end of August for the fall school semester? This flies in the face of reason. She was travelling to Italy to visit her father prior to returning to school here in the United States. Otherwise she could have flown standby in early to mid-August on her mother's passes, saved the $2,204 and spent two or three weeks with her father before school commenced in Italy. They purchased these tickets to ensure J.P. had a vacation with her father prior to school and that she was guaranteed seats on these flights. Given Petitioner's concern about his ability to have a guaranteed seat on a flight in late August for his return to Italy, this caring father would certainly not be allowing J.P. to fly standby in late August to return to Italy in time for school.

(l) June 2012, Ms. Thoreson retains legal counsel, Attorney Tom Glasgow, in Illinois to commence divorce proceedings. (Trial Transcript p.112 lines 2- 13 ECF No. 24)

(m) June 27, 2012, Ms. Thoreson drops J.P. at O'Hare airport to travel with Dr. Prouse to Washington D.C. on her stand by passes on American Airlines. (Trial Transcript p.83-lines 18 through p.84 line- 21 ECF No. 24)

(n) July 1, 2012, Dr. Prouse is served with the Petition in the divorce action while in Chicago. (Trial Transcript p. 36 lines 11-21 ECF No. 24).

(o) July 2nd-25th, Dr. Prouse has telephone and e-mail contact with Attorney Glasgow and never suggests J.P. is expected to return to Italy for the beginning of school in late August or early September of 2012 (Affidavit of Attorney Glasgow and Exhibit B thereto).

(p) July 25, 2012, Dr. Prouse retains legal counsel (Respondent's Trial Exhibit 21)

(q) July 30th-31st, Dr. Prouse files his criminal complaint and Hague action in Italy (Petitioner's Trial Exhibit 3 & 4).

(r) September 5, 2012, Dr. Prouse files this Hague action in the Western District of Wisconsin. (ECF No.1).

(s) Petitioner made no effort to enroll J.P. in any school in Italy for the fall semester. (Trial Tr. p.58 lines 17 through p. 59 line 18, ECF No. 24). In fact he has made no plans at all to arrange for J.P. to live or attend school back in Italy, or at least none that he shared with the Court.

(t) Petitioner would like this Court to believe that the parties planned for Ms. Thoreson to send J.P. back to live in Italy while she remained in the United States. (Trial Tr. p.34 lines 18-25, ECF No. 24)  But there was no indecisiveness when Ms. Thoreson heard Petitioner's version of this possibility for the first time in Court on September 18th.  She was adamant and very credible that there was never any such conversation with her husband, nor would she possibly consider living in a foreign country away from her daughter.  (Trial Tr. p. 83 lines 2-14, ECF No. 24).

(u) Finally, even though Dr. Prouse had flown from Italy to attend the hearing on September 18, 2012, he never took the stand to refute or disagree with any

testimony offered by Ms. Thoreson regarding his communications, the end of the marriage or his suggestion to move J.P. to Arizona.   If Ms. Thoreson was lying, he surely would have taken the opportunity to explain to this Court his version of this conversation.

## V.  APPLICABLE LAW

**A.**     **Petitioner Has Not Met His Burden Of Proving A "Wrongful Removal" And The United States Is Now J.P.'S Habitual Residence**

The Ninth Circuit analyzed wrongful removal under the Hague Convention in the seminal case of  *Mozes v. Mozes,* 239 F.3d 1067, 1070 (9th Cir. 2001) explaining:

> The key operative concept of the Convention is that of "wrongful" removal or retention. In order for a removal or retention to trigger a state's obligations under the Convention, it must satisfy the requirements of Article 3:
> The removal or the retention of a child is to be considered wrongful where-
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
> Convention, art. 3, 19 I.L.M. at 1501. A court applying this provision must therefore answer a series of four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes* at 1070.

The evidence shows clearly in this case the parties shared a mutual intent for J.P. to move with her mother to the United States.  The question is at what point in time does

Dr. Prouse claim a "wrongful removal or retention"?  Dr. Prouse admits he first raised his claim of wrongful retention on or about July 30, or 31, 2012.  (Petitioner's Trial Exhibits 3 & 5; Trial Tr. p.44 lines 16-24, ECF No. 24)  At that time, J.P. was a habitual residence of the United States and had lived here for over seven (7) months.

The often cited quote from *Mozes* regarding "habitual residence" reads:

> Lord Brandon has discussed the distinction between abandoning a prior habitual residence and acquiring a new one:
> > There is a significant difference between a person ceasing to be habitually resident in country A, and his subsequently becoming habitually resident in country B. **A person may cease to be habitually resident in country A in a single day if he or she leaves it with a settled intention not to return to it but to take up long-term residence in country B instead**. Such a person cannot, however, become habitually resident in country B in a single day. An appreciable period of time and a settled intention will be necessary to enable him or her to become so.

*Mozes* at 1074-75 (emphasis added).

Ms. Thoreson is not claiming that J.P. has been here for more than one year under Article 12 of the Convention and hence needs to make the requisite showing that J.P. is now "settled".  Ms. Thoreson's position is quite simply that, pursuant to Article 13 of the Hague Convention, the Petitioner consented to and in fact actively participated in the decision for her to move with J.P. to the United States.  She has more than met her burden by a preponderance of the evidence as required under 42 U.S.C. § 11603 as to the intent and consent of the Petitioner in moving J.P. here in December of 2011.

The fact that J.P. is now "settled" here in the United States therefore becomes highly relevant under *Moze*s and its progeny.  *Mozes* sets forth a two-step analysis in determining a child's "habitual residence".   The first test involves the inquiry as to

13

whether or not the parents demonstrated an intent to abandon the prior habitual residence. *Id* at 1075.   That Dr. Prouse and Mrs. Thoreson's shared intent to abandon their marital home in Italy and relocate to the United States is undisputable and the evidence is overwhelming.  Hence the second step of the inquiry becomes necessary. The second step of the analysis is whether there has been a change in geography for an appreciable period of time so that the child has become settled or "acclimatized".  *Id* at 1078.

*Mozes* was adopted by the Seventh Circuit in <u>Koch v. Koch</u>, 450 F.3d 703, (7th Cir. 2006) holding; "The district court reluctantly used *Mozes* in the alternative, but we see no reason to disavow the *Mozes* approach and believe it is far more flexible than the district court inferred."  *Koch* at 715.

### B.   <u>Ms. Thoreson Proved By More Than A Preponderance Of The Evidence That The Parties Shared A Joint Intent To Relocate The Family And Establish A  Residence In The U.S.</u>

The facts establish that the parties shared a mutual intent to permanently relocate to the United States when Robin and J.P. left Milan in December of 2011.  They were experiencing financial difficulties and considered several countries where their prospects were brighter.  Petitioner himself rented out the former marital home for a term of four to eight years.  Petitioner himself wrote to J.P.'s school advising she would not be returning after December 21, 2011, because the family was moving to the United States for work reasons.  Petitioner purchased roundtrip airline tickets that would allow Ms. Thoreson and J.P. to relocate the family pets.

Our Seventh Circuit adopted the analysis set forth by the Ninth Circuit in the seminal  *Mozes* decision, in its opinion in <u>Koch v. Koch</u> 450 F. 3d 703 (7th Cir. 2006).

14

> Following *Mozes,* most of our sister circuits **focused on the parents' last shared intent in determining habitual residence**. *See, e.g., Gitter,* 396 F.3d at 131-33 (finding the *Mozes* opinion "particularly instructive" in determining habitual residence by considering the intentions of the parents as of the last time their intentions were shared); *Ruiz,* 392 F.3d at 1252-55

*Koch* at 715 (emphasis added).

Intent cannot be determined in this case by Petitioner's self-serving testimony subsequent to the commencement of divorce proceedings.  It must be decided by all of his actions as well as his inaction.  Intent is a fact that jurors and courts routinely determine particularly in criminal cases.

> Intent is a fact: "The state of a [person's] mind is as much of a fact as the state of his [or her] digestion." *State v. Lossman,* 118 Wis.2d 526, 543, 348 N.W.2d 159 (1984) (quoting William L. Prosser, The Law of Torts § 104, at 745 (3d ed.1964)). Intent is a fact that "must be inferred from the acts and statements of the person, in view of the surrounding circumstances." *Pfeifer v. World Serv. Life Ins. Co.,* 121 Wis.2d 567, 569, 360 N.W.2d 65 (Ct.App.1984).

<u>*Welytok v. Ziolkowski*</u>, 2008 WI App 67, 312 Wis. 2d 435, 453, 752 N.W.2d 359, 367

All of the evidence confirms the family intended to relocate to the United States for an indefinite period until Petitioner could sort out the financial troubles his aspirations had created.  (Respondent's Trial Ex. 9).  Petitioner himself testified that he did not know what country the parties would be living in in the future after the family abandoned its marital residence and home in Italy.  (Trial Tr. p. 64 lines 18-22, ECF No. 24).  While Ms. Thoreson was willing to move anywhere with Dr. Prouse in an effort to save their marriage, the overwhelming evidence established that the last **shared intent** of the parties was to establish residency in the United States.  Ms. Thoreson and J.P. have honored that

agreement and followed through on the family's plan as it was reached in December of 2011.

**C.      J.P.'s Habitual Residence Is Now The United States**

Respondent repeatedly attempted to introduce evidence as to J.P.'s current habitual residence at the time of the September 18th hearing.  (Trial Tr. p. 70 line 21- p 71 line 25, p. 116 line 21-25 and p.118 line 3-13, ECF No. 24).  The second prong of the analysis in *Mozes* is "whether there has been a change in geography for an appreciable period of time so that the child has become settled or "acclimatized".  *Id* at 1078.

The "appreciable period" under *Mozes* does not require one year of time to pass as does Article 12 of the Convention.  In fact there is not even a six (6) month minimum as required under § 822.21 (1) (a) Wis. Stats., the Uniform Child Custody Jurisdictional Act. (UCCJA).   The judicial website established for guidance in deciding these difficult cases brought under the Hague Convention makes precisely this point:

> 4. Habitual Residence
>    a. Habitual residence. Habitual residence is not defined in the Treaty, but it has come to mean, through interpretation, the place where the child has lived for some period of time for a settled purpose. **Theoretically a habitual residence could be acquired in one day, such as where a family picks up and moves lock, stock and barrel to another country for the foreseeable future.** The cases describe the concept of habitual residence as one which is "fact intensive".  **Unlike the 6 months period of time required to acquire a "home state" under the UCCEA, a child's habitual residence can be acquired in a much shorter period of time.** Temporary and time limited relocations, even though for a longer period of time, may not result in a change of a residence, e.g. parents change location in order to complete their education.  (emphasis added)

Honorable James D. Garbolino, *A Quick Overview of the Convention,* Hague Judicial Resources,
http://www.haguejudicialresources.org/Hague_Judicial_Resources/Quick_Overview.html

If this Court is considering issuing an Order sending J.P. back to Italy on the basis that Italy is her "habitual residence" we have a woefully inadequate record on which to base such a decision.

> The term "habitual residence" is "not defined by either the Hague Convention or the ICARA." *Kanth v. Kanth,* 232 F.3d 901, 2000 WL 1644099, *1 (10th Cir. Nov. 2, 2000). Rather, a child's habitual residence "is defined by examining specific facts and circumstances." *Id.* Accordingly, the inquiry into a child's habitual residence "*is a fact-intensive determination that necessarily varies with the circumstances of each case." Whiting v. Krassner,* 391 F.3d 540, 546 (3d Cir.2004). Ultimately, the determination of a child's habitual residence is a mixed question of fact and law. *Id.* (emphasis added)

*Carrasco v. Carrillo-Castro*, CIV. 12-268 MV-WDS, 2012 WL 1948996 (D.N.M. May 29, 2012).

This Court must consider all of the relevant facts in determining J.P.'s habitual residence. As the Seventh Circuit Court pointed out in its decision in *Koch:*

> Often, by the time one parent has filed an action under the Convention for the return of a child, the parents no longer share an intent on the child's habitual residence. Because of this complication, the *Mozes* court acknowledged that the representations of the parties likely cannot be accepted at face value, and the court should determine "from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is." 239 F.3d at 1076.

*Koch* at 713.

No reported decision makes such an important decision on the basis of an emergency hearing held within days of the filing of a Petition. The reported decisions all involve hearings held after discovery and some months, if not years have elapsed. The situation before this Court does not involve one party surreptitiously removing a child from a contracting country on a pretext or without notice. Nor is this a case where the

17

parent charged with the alleged wrongful removal has changed her mind after the fact and decided not to return.  This is a case unlike any in the reported decisions. This is a case where the purported "left behind" parent changed his mind after the move and now wants to manipulatively use the Hague convention to gain an advantage in the family law proceedings by filing false claims.

The closest factual case Respondent's counsel could locate is found at <u>Silvestri v. Oliva</u>, 403 F. Supp. 2d 378, (D.N.J. 2005).  In *Silvestri* the parties began to formulate a plan to relocate their family from Argentina to the United States.  After the mother and children had settled and the father had spent some time in the United States, he changed his mind and wanted to return to Argentina.

> ("[E]ven if, as Petitioner maintains, he and Respondent only intended to live in the United States for a 'prolonged' but limited period of time while trying to resolve their marital problems, rather than permanently, that intent is still sufficient to establish a new habitual residence."). Here, the evidence of record demonstrates the parties' shared purpose was to discard Argentina as the habitual residence, and at least for a limited period of time, acquire a new habitual residence in the United States.

*Silvestri* at 385.

Confirming the "shared intent" test the Court went on in *Silvestri* to point out "Even though Petitioner eventually and unilaterally formed an intent to return to Argentina, that change of mind does not alter the parents' initial shared intent to make the United States their new habitual residence. *See Sasson,* 327 F.Supp.2d at 497 (citing *In re Morris,* 55 F.Supp.2d 1156, 1162-63 (D.Colo.1999))." *Id* at 386.

### D.   Our Seventh Circuit Has Adopted The Mozes Analysis As To The Role Of Parental Intent And Not That Of The Sixth Circuit As Set Forth In Friedrich

Petitioner focuses his legal argument on the decision issued by the Sixth Circuit in *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996).   However, our Seventh Circuit has never adopted the *Friedrich* analysis set forth in that 1996 opinion as to determining parental intent in actions commenced under the Hague Convention.   In two decisions subsequent to *Friedrich* and *Mozes*, the Seventh Circuit has expressly followed the Ninth Circuit's well-reasoned decision in *Mozes* as our controlling precedent.   See *Koch v. Koch,* 450 F.3d 703 (7th Cir. 2006) and *Norinder v. Fuentes*, 657 F.3d 526 (7th Cir. 2011).

> In *Koch v. Koch,* 450 F.3d 703 (7th Cir.2006), we discussed in detail how habitual residence should be determined, and we adopted a version of the analysis set out by the Ninth Circuit in *Mozes v. Mozes,* 239 F.3d 1067 (9th Cir.2001). The question is whether a prior place of residence (in this case, the United States) was effectively abandoned and a new residence established (here, Sweden) "by the shared actions and intent of the parents coupled with the passage of time." *Koch,* 450 F.3d at 715. Often parents will not agree about what their shared intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say. *Id.* at 714.

*Norinder v. Fuentes*, 657 F.3d 526, 534 (7th Cir. 2011)

In *Norinder* at page 530 the Seventh Circuit noted the decision in *Friedrich* for the proposition that it is not the Court's province to "resolve messy domestic conflict.", but failed to adopt its substantive holding.  In addition, *Friedrich* bears no factual similarity to the present action.  In *Friedrich*, the mother secretly departed with the minor child and the issues presented on appeal involved the definition of what it meant to "exercise custody rights" and the standard for a determination that a return of the child would result

in a "grave" risk of harm. *Friedrich* at 1063. The wrongfully removing mother also claimed the Court erred in not finding her husband had consented to the removal of the minor child. The Court pointed out:  "The deliberately secretive nature of her actions is extremely strong evidence that Mr. Friedrich would not have consented to the removal of Thomas. For these reasons, we hold that the district court did not abuse its discretion in finding that Mrs. Friedrich took Thomas to America without Mr. Friedrich's consent." *Id* at 1069.  This decision can hardly be utilized to determine "intent" in a case such as ours where the parties agreed to the child moving to the United States.

*Friedrich* is informative to note that the child was wrongfully removed in August 1991, the Petition was filed on September 3, 1991, and the decision was issued after a second appeal on March 13, 1996, following a remand to the District Court which allowed for additional discovery and a new hearing.

Petitioner also relies on the unreported Memorandum Opinion and Order in *Tabacchi v. Harrison*, 99 C 4130, 2000 WL 190576 (N.D. Ill. Feb. 10, 2000). Respondent fails to perceive how this opinion is remotely on point or helpful to this Court in its analysis of the facts presently before the court.  *Tabacchi* is another case where a mother fled unannounced with a child from their habitual residence in Italy without any notice or discussion with the father on January 16, 1999.  The father reported the incident to the police the following day and ultimately filed an action under the Hague Convention on June 22, 1999.  The bench trial in *Tabacchi* was held over three days on November 24, 29, and December 3, 1999.

*Tabacchi's* focus is a discussion regarding the "grave risk" exception and follows *Friedrich* and never mentions *Mozes*. *Tabacchi* provides no guidance for this Court with regards to the "habitual residence" and "last shared intent" of the parties that are determinative of the present action.

The final authority Petitioner relies on is an Ohio case, <u>*Ciotola v. Fiocca*</u>, 86 Ohio Misc. 2d 24, 684 N.E.2d 763, 765 (Com. Pl. 1997). This case also involves the removal of a child from Italy. Italy again appears to be the only common factor between the two cases. In *Ciotola* the wrongfully removing wife changed her mind about the child's return. In the present action it is Petitioner who changed his mind about the family's agreed upon plan for their future. *Ciotola* arose before the 2001, well-reasoned decision in *Mozes* as adopted by our Seventh Circuit. The only uncertainty regarding the Prouse family's move to the United States was the date that Dr. Prouse was going to join his family in the United States as the parties had agreed. There was never any uncertainty that J.P.'s residence would be in the United States.

## VI.  CONCLUSION

Petitioner has failed to show any wrongful taking or retention of J.P. under the Hague Convention.   The evidence shows the parties shared a joint intent to relocate to the United States when Ms. Thoreson left with J.P. in December of 2011. The evidence overwhelmingly demonstrates Dr. Prouse changed his mind about relocating in late July 2012 after being served with divorce proceedings and obtaining legal counsel. By July of 2012, J.P. was a habitual resident of Wisconsin and this Court should make that finding as a matter of law.

21

**WHEREFORE**, Petitioner respectfully requests this Court:

1)  Dismiss the Petition for Return of Minor Child on its merits finding there was no wrongful removal or withholding and awarding Respondent actual costs and attorneys' fees;

2)  Issue a Decision determining that the United States is now J.P.'s habitual residence;

3)  In the alternative set a scheduling conference pursuant to Fed. R. Civ. P. 16 to determine whether or not J.P. is settled in the United States;

4)  In the alternative, if the Court is considering sending J.P. back to Italy, include in said Order provisions regarding the Petitioner's verification of dismissal of any criminal action in Italy, and requiring Petitioner to make financial accommodation for the living expenses of Respondent and J.P. upon return to Italy. See *Tabacchi v. Harrison,* supra.

Respectfully submitted this 2nd day of October, 2012.

SIPSMA, HAHN & BROPHY, L.L.C.

By:  _____/s/ *Kenneth R. Sipsma*_____
        Kenneth R. Sipsma
        State Bar Member No. 1022383
        Josann M. Reynolds
        State Bar Member No. 1014655
        701 East Washington Avenue, Suite 201
        Madison, Wisconsin 53703
        (608) 243-1230
        *ksipsma@shblawyer.com*

ATTORNEYS FOR ROBIN K. THORESON