IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GIORGIO PROUSE,

                                                 OPINION AND ORDER

                Petitioner,

                                                 12-cv-644-bbc

    v.

ROBIN K. THORESON,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Petitioner Giorgio Prouse brought this action under the Hague Convention, petitioning for the return of his minor daughter to Milan, Italy, and alleging that his wife, respondent Robin Thoreson, had acted wrongfully in removing their daughter to the United States from her habitual residence in Milan and retaining her here, in breach of his rights of custody. In addition to an order in his favor, he asked for an award of fees and costs incurred in bringing this petition. Jurisdiction is present. 42 U.S.C. § 11603(a) (giving state and federal courts concurrent original jurisdiction over actions arising under Hague Convention).

The Hague Convention governs proceedings for the prompt return of children wrongfully taken or kept away from their habitual residence. Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501, Preamble. The Convention is designed to deter parents from wrongfully taking a child

out of the family and social environment in which the child's life has developed to a forum that the removing or retaining parent believes will be more favorable to obtaining a right of custody. Elisa Perez-Vera, Explanatory Report, ¶ 11, 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982); Koch v. Koch, 450 F.3d 703, 711-12 (7th Cir. 2006).

After reviewing the evidence and the parties' briefs, I conclude that petitioner has not proved that he is entitled to relief under the Hague Convention. Before respondent brought their daughter to the United States, the family was experiencing financial difficulties and had decided to leave Milan. The parties' shared intent was that after petitioner finished his medical residency, the entire family would relocate to the United States, where earnings for doctors are higher than in Milan. In the interim, respondent would move to the United States with their child, who would live with her maternal grandparents in Beloit, Wisconsin, and attend school while respondent was working as a flight attendant on international flights out of Chicago. Respondent's removal of the child from Italy was initiated by both parents and intended to be indefinite. The objective facts point to the conclusion that the United States has supplanted the child's habitual residence in Milan "as the locus of the [child's] family and social development." Mozes v. Mozes, 239 F.3d 1067, 1084 (9th Cir. 2001). Therefore, neither the removal of JP nor her retention in this country can be held to be wrongful.

From the evidence adduced at the evidentiary hearing held in this case on September 18, 2012, I find the following facts.

FACTS

Petitioner Dr. Giorgio Prouse and respondent Robin Thoreson are married and the parents of an eight-year-old child, JP. Petitioner lives in Milan, Italy, and works as a cardiovascular surgeon. Until December 2011, respondent lived in Milan and worked as a flight attendant out of Chicago, Illinois. At present, she divides her time between Chicago, where she continues to work as an international flight attendant, and Beloit, Wisconsin, where JP lives with respondent's parents and attends a local public school.

JP was born in Milan and lived there with her parents for most of her life. She attended a private international school, took horseback riding lessons and had a close relationship with her paternal grandmother, who lives in Milan. JP visited the United States regularly during her school breaks and spent time here with her maternal grandparents.

In the summer and fall of 2011, while petitioner was still completing his residency program, the family began experiencing financial difficulties. Throughout 2011, the parties discussed various living arrangements after petitioner completed his residency in 2012. Initially, the parties discussed a wide variety of options, including moving to the United States, Switzerland, South Africa or Australia before they settled on a move to the United States. The parties agreed that respondent and JP would go to the United States, where JP could attend the local school and live with respondent's parents while respondent worked. (Respondent had held the same job while she lived in Milan, but her earnings had been reduced considerably by the cost of commuting to work in Chicago.)

3

On December 28, 2011, respondent and JP flew to the United States. They paid to fly on Swiss Air, rather than flying standby on respondent's passes so that they could bring some of their pets with him in the cabin. (Respondent's employer, American Airlines, does not permit pets in the cabin.) They moved in with respondent's parents in Beloit, Wisconsin, where JP began attending school in the local school district. Respondent's parents cared for JP while respondent lived during the week in Chicago. Respondent made a trip back to Milan in early January to finish cleaning their previous home and to bring some of the family pets to the United States. Again she purchased tickets on an airline (Lufthansa) that allowed pets in the cabin so that she could bring the rest of the family pets with her on the return trip. She left a few personal items in Milan, including some of JP's outgrown clothes and toys, a 1998 car with Illinois plates and a saddle and riding boots she no longed needed because her horse had died before she left Milan.

When respondent and JP left Italy, petitioner listed the family's home for sale or lease and entered into a four-year lease with the right to renew the lease for four additional years. (He testified that the renters broke the lease in the late summer of 2012; he did not say whether he had found new tenants or a buyer for the property.) Next, he moved into the family's old apartment, a small one-bedroom below ground unit adjacent to his mother's home. Finally, he wrote JP's school in Milan and informed the administrators that JP would no longer be in attendance due to "our move" to the United States for "sudden, unexpected reasons of work." Dkt. #34-2. (Petitioner says that he referred to "our move" only in an attempt to persuade the school to refund a portion of JP's tuition that he had already paid.)

4

He did not ask the school to credit JP's second semester tuition to the following year's tuition.

Petitioner, respondent and JP visited each other in the United States and Italy in the following months. Petitioner visited the United States in January 2012 for JP's birthday. At that time he asked respondent to book the return portion of his Lufthansa flight for August "when returning to Italy would be difficult." Dkt. # 34-23. (Apparently in the interim he would fly back and forth to Italy on standby, which he was entitled to do as respondent's spouse.) He made no mention of taking JP back to Milan with him in August or any other time. Id. The parties discussed a winter skiing vacation, but never took one. Respondent and JP then visited petitioner in Italy in March and April of 2012 for Easter break. They booked another trip for JP to go to Italy between July 14, 2012 and August 4, 2012.

On April 13, 2012, petitioner informed respondent over the telephone that he wished to end their marriage. Respondent emailed petitioner and told him that she would do anything to make the marriage work, including moving back to Italy, transferring to another city that had more frequent flights to Milan on which she could work or moving somewhere else after petitioner finished his residency. Dkt. #34-9. Four days later, she flew to Italy. During her visit, she asked petitioner where she and JP would live. Petitioner told her that "the United States is a big place" and that Arizona would be a good place for her and JP because respondent's friend Michelle could help respondent raise JP.

That summer, respondent became convinced that she and JP should no longer live


with her parents and should look for a place of their own. On June 6, 2012, respondent emailed petitioner, explaining her concern and her desire to talk to him about moving and whether he would be able to help her financially. Dkt. #26-1. Petitioner agreed to help respondent and JP rent their own place. Petitioner and respondent communicated a few more times about the price of a rental, but eventually respondent dropped the issue. Petitioner assumed it was because she had worked things out with her parents.

Before petitioner began this action, he did not tell respondent that he wanted JP to return to Italy for school in the fall. (He testified that he told her this three times but his testimony on this point is not credible, for at least two reasons. First, petitioner arranged for JP to visit him in Italy for three weeks from July 14 until August 4, 2012. The cost of the ticket for the flight was $2,204, although JP could have flown standby on her mother's flight attendant passes. It defies reason to think that, financially strapped as he was, petitioner would have arranged this expensive trip for JP if he expected that JP would be returning to Milan three or four weeks later for the fall semester of school. Second, he took no steps to enroll JP in school, although the enrollment cutoff is the April preceding the start of the next school year.).

JP had a successful spring semester of school in Beloit. She has no language barrier because of her bilingual household and her attendance at the International School. She received high scores on her report card and her teacher commented that "JP is a wonderful addition to our class. She has made friends easily and adapted well to a new routine." Dkt. #34-4. JP participated in sports and equestrian camps and found a stable at which to ride.

Although JP was engaged in life in the United States, respondent emailed petitioner on June 17, 2012 that JP missed "home, the dogs, you, etc." Dkt. #34-17.

On June 26, 2012, respondent filed for divorce in Cook County, Illinois. The next day, petitioner came to the United States to attend his sister's wedding in Washington D.C. Respondent dropped JP off at the Chicago airport so that she could travel with petitioner to the wedding. She picked up petitioner and JP from the airport when they returned from Washington D.C. The next morning, July 2, 2011, respondent and JP took petitioner to the airport for his return flight to Italy. At some point while petitioner was in Chicago, a private investigator served him with respondent's divorce petition.

Despite the pending divorce, the parties continued to communicate about JP. On July 7, 2012, respondent emailed petitioner to inform him that JP had concerns about her upcoming summer trip to Italy. JP's cat was seriously ill, and respondent said that JP was worried about leaving the cat for the entire length of the planned trip. In a July 10, 2012 email, petitioner agreed that JP should reschedule her trip for another time without mentioning JP's coming back to Milan in the fall for school. He also informed respondent that he planned to come to the United States at the end of the month and sit down with respondent and her attorney, noting that he expected "that we decide things together." Dkt. #26-5. On July 13, 2012, he emailed respondent to say abut JP:

> And if you ever feel like it you can keep me updated. Afterall [sic] i [sic] am still her father, at least from a biological point of view even though it will be some other man that will bring her up and that she will grow up with. As you say[] . . . it was all my choice. A tough one believe me and one that will way [sic] on me for the rest of my life. Good luck with the situation anyhow. I'm sure you will handle it fine."

Dkt. #34-12.

Respondent replied in an email that she was disappointed that petitioner had not contacted JP more frequently and told him that she did not intend to try to keep him from JP. She suggested that he get a phone for JP with which she could more easily receive his calls. Dkt. #34-19.

After a few communications with respondent's divorce attorney, petitioner obtained legal counsel. On July 30-31, 2012, he filed a criminal complaint and an action under the Hague Convention in Italy, followed by this action, which he filed on September 5, 2012. On August 3, 2012, respondent enrolled JP for the 2012-13 school year in Beloit.

OPINION

The Hague Convention sets out five elements of a prima facie cause of action for return of a child: (1) the child was wrongfully removed or retained; (2) the child was removed from its habitual residence; (3) the removal breached the left-behind parent's rights of custody under the law of the child's habitual residence; (4) the left-behind parent was exercising those custody rights; and (5) the child is under the age of sixteen. Hague Convention, Articles 1, 3. The petitioner bears the burden of proof and must prove each of the elements by a preponderance of the evidence. 42 U.S.C. §11603(e).

The initial, and generally determinative question is the second one: whether the child was removed from its habitual residence. If so, then the other questions must be answered under the law of the jurisdiction from which the child was removed; if not, the matter can

be tried in a state court under local law.  Klijowska v. Haines, 463 F.3d 583, 586 (7th Cir. 2006).

In Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001), the Court of Appeals for the Ninth Circuit undertook a length analysis of the term "habitual residence" that other courts have relied on since then.  E.g., Koch v. Koch, 450 F.3d 703 (7th Cir. 2006) ("virtually ever circuit court to consider the issue of habitual residence since Mozes has adopted some variation of its approach").  In Mozes, the question was the habitual residence of four children who had moved with their mother to California for a period of time while the father remained in Israel.  The father had consented to the move to give the children a chance to learn English and experience American culture but had not intended the visit to be a permanent move.  When the mother filed for divorce at the end of the first year, the father brought an action for the return of the children under the Hague Convention.

In deciding that the children had not changed their habitual residence by moving to the United States, the court of appeals canvassed the law on the meaning of the term, emphasizing Congress's recognition of "the need for uniform international interpretation of the Convention."  42 U.S.C. § 11601(b)(3)(B).  The court began by noting that objective temporal baselines can be misleading.  Three years of living abroad might suggest an intent to change one's place of habitual residence or, if they are spent on a special course of study, a mere "temporary absence of long duration."  Mozes, 239 F.3d at 1074.  What is needed is a "settled purpose" to abandon the home left behind.  Id. at 1075.  It is not necessary that this intention be expressed; it can be drawn from actions.  Id.

9

Because the person involved in the change of residence is a child, it is generally the "settled purpose" of the child's parents that must be determined. This may be difficult to determine as a factual matter. People do not bring actions under the Convention when the parents are of one mind about where the child's habitual residence. In Mozes, the court of appeals suggested that where the parents have taken all the steps leading to a new habitual residence, this evidence should lead to a conclusion that the child's residence has changed, even if one parent might have had reservations about the move. Id. at 1074. When the change in residence was always intended to be for a specific, delineated time, the changed intentions of one parent will generally not prevail. In other, more complicated situations, the petitioning party is suing because the other party has not brought the children back after a stay in another country and the trial court must determine whether the parents did or did not share a settled agreement for the stay to last indefinitely. Id. at 1077.

A third piece of the puzzle is the child's adjustment to the new residence, but this inquiry is relevant only when the parties' intent is uncertain. The court's function is not to determine whether the child is happy in its current location, but "whether one parent is seeking unilaterally to alter the status quo with regard to the primary focus of the child's life." Id. at 1079. There is no set time period in which habitual residency can be established. Mozes, 239 F.2d at 1076-77 ("appreciable amount of time"); Brooke v. Willis, 907 F. Supp. 57, 61 (S.D.N.Y. 1995) ("one summer").

In this case, the analysis is straightforward. Both parties agreed that their financial difficulties required leaving Milan and taking up residence in the United States, where they

10

could reduce their living expenses and where petitioner would be likely to find a higher paying position than he could obtain in Italy. They agreed that respondent would leave in December 2011 with JP, who would live with respondent's parents while respondent increased her work hours as a flight attendant (and reduced her commuting expenses), and petitioner would come when he finished his residency. With that plan in mind, petitioner applied for a refund of JP's tuition from her expensive international school, saying that the family was moving to the United States; put the couple's home on the market, either for sale or rent; and moved back into a small below ground apartment in Milan. Respondent cleaned out the family home, moved all the family pets to the United States and enrolled JP in a local school in Beloit, Wisconsin, where JP's grandparents lived. This is ample evidence of the parties' settled purpose in December 2011 to establish a new residence in the United States. JP's eight months of residency in this country, her success in the local schools and her involvement in horseback riding support a finding that her habitual residence is now in the United States. This finding is bolstered by the fact that home environment to which she was accustomed in Italy no longer exists; her home was rented out and she is no longer enrolled in the school she had been accustomed to attending.

   Petitioner argues that he never acquiesced in JP's continued residence in the United States. The proof is to the contrary. As explained at length, he made no arrangements for her to come back to Italy to attend school. The record contains nothing in writing to suggest that he ever told respondent that he wanted JP to return to Italy to live with him.

   The finding that JP's habitual residence is not the United States answers the question

whether she was wrongfully removed or retained. She was not. She came here and continues to reside here in accordance with a plan developed by both of her parents at a time when they had a shared intent. Koch, 450 F.3d at 715 (following Mozes, most courts focus "on the parents' last shared intent in determining habitual residence"). Her father's subsequent decision to end his marriage to her mother does not mean that he did not have the settled intent in December 2011 to move his family to the United States for an indefinite period.

As to whether the removal breached petitioner's rights of custody under the law of the child's habitual residence, that question is now moot in view of the finding that the removal was in accordance with the parties' agreement to move to the United States, as is the question whether respondent was exercising his custody rights at the time. In short, petitioner has failed to show that the Hague Convention provides him any right to have JP returned to Italy.

ORDER

IT IS ORDERED that petitioner Giorgio Prouse's petition for the immediate return of his daughter to Milan, Italy under the Hague Convention of October 25, 1980 is

DENIED.  Petitioner's request for an award of fees and costs is DENIED as well.

Entered this 22d day of October, 2012.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge